UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO.: 3:17-cr-00096-JAM |
| | ) | |
| v. | ) | July 2, 2018 |
| | ) | |
| WILLIAM LIEBERMAN | ) | |
| | ) | |

**DEFENDANT WILLIAM LIEBERMAN'S MEMORANDUM IN AID OF SENTENCING**

Respectfully submitted,
WILLIAM LIEBERMAN

By:       */s/ Joseph W. Martini*_____
            Joseph W. Martini
            Federal Bar No. ct07225
            WIGGIN AND DANA LLP
            281 Tresser Boulevard, 7th Floor
            Stamford, CT 06901
            Phone: (203) 363-7603
            Fax:  (203) 363-7676
            Email:  jmartini@wiggin.com

**Preliminary Statement**

Billy Lieberman has never been in trouble with the law.  For his first 32 years, Billy was simply a good son and grandson and a loyal friend to many, many people.  In fact, perhaps the worst that could be said about Billy was that he was uncertain about his future career path, something that frustrated his parents.

In 2008, in the midst of the financial crisis, Billy, newly earned MBA in hand, decided that he wanted to make it in the world of finance.  Billy wanted it so bad that he picked up and moved to New York without any real prospects or money, sleeping on a friend's couch until he could find a job.  Through an old friend he was introduced to Izzy Goldreich, who, unbeknownst to Billy at the time, was (or would soon become) a fixture in the world of stock fraud.[1]  Billy fell into Izzy's world, eventually becoming a knowing participant in fraudulent conduct, first with Izzy, and then with Chris Meissenn, another person with a stock fraud pedigree he met through Izzy.[2]  (Exh. A at 1–3.)

Billy went down the wrong path, allowing himself to be lured by Goldreich and Meissenn into their world.  Billy was taken in by their lifestyle, the prospect of easy money, and their manipulative gestures of friendship, and ultimately became embroiled in a series of fraudulent schemes that collectively cost innocent victims millions of dollars in investments.  There are reasons why this happened – Billy's "pleaser" personality and his naïveté – but Billy has

---

[1] Most recently, in 2015 Israel "Izzy" Goldreich was convicted in the Eastern District of New York of conversion of money of the United States in violation of 18 U.S.C. § 641, a case that involved funds represented by an undercover FBI agent to be proceeds of the sale of fraudulent stock certificates.  *See United States v. Goldreich*, No. 1:14-cr-00617-BMC (E.D.N.Y.).  Goldreich was released from prison in early 2017 and has seemingly escaped prosecution in this case.

[2] Meissenn started his career in the boiler room of *The Wolf of Wall Street* firm Stratton Oakmont in the early 1990s and had been perpetuating stock frauds for years when Billy met him.  *See* Mem. in Aid of Sentencing at 7–8, *United States v. Messeinn*, No. 3:16-cr-00201-JAM (D. Conn. May 1, 2018), ECF No. 41.

acknowledged his wrongdoing and knowledge of the fraudulent conduct of which he became a part, and he has now done so without excuses.

For Billy, life in this world came to an end on July 13, 2016, when federal agents knocked on his door in Florida. Rather than keep up the lies that dominated his life, Billy made the decision at that very moment to try and right his wrongs, to try to do the right thing. ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████

Billy has demonstrated extraordinary acceptance of responsibility and remorse, through ████████████████████████ his guilty plea and his ongoing efforts to make restitution. Billy pleaded guilty to serious offenses and agreed to a Sentencing Guideline range that calls for a term of imprisonment frequently associated with violent offenses. While there are legal arguments for why that starting point Guideline range is way too high, Billy realizes that it is driven by the significant losses he helped cause to the many victims, and by making the legal

arguments below he in no way diminishes the impact to these victims. In fact, Billy has read the victim impact statements, and his letter to the Court reflects his realization of the harm that he has caused them. (Exh. A at 4.) Billy is ashamed of his misdeeds and is deeply remorseful for the harm he has caused to the many victims. (*Id.* at 5.)

Unlike many offenders, Billy has made genuine efforts at restitution. During the two-year period since this case started, Billy did not sit idly by; rather, in the midst of a tumultuous time spent trying to hold his family together ███████████████████████████ ███████████████████████, Billy started a legitimate recycling business, taking advantage of his father's expertise in this area. Billy was motivated by a desire to turn his life around, and make money to support his family and pay back the victims of his offense. While Billy's efforts have had these positive effects, they may also mean that employees of Billy's fledgling business will be hurt if Billy can no longer carry on this business. And despite his uncertain financial future – because of this case and the dissolution of his marriage – Billy has managed to set up an account devoted to victim restitution. That account now contains approximately $12,200, and there may be additional and significant amounts that Billy can add to this account.

After his marriage, Billy and his wife moved to Florida, close to his wife's parents, and made new friends there. Since July 2016, Billy's marriage has fallen apart and he has been shunned by his in-laws and his friends in Florida. Billy is also acutely aware of the harm posed to his three young children, and despite the fact that his soon to be ex-wife and her family have turned their backs on him, he is deeply sorry to them as well.

Billy's conduct in this case does not mean that he is not the "compassionate, loyal, kind, charitable" father, son, grandson, brother, uncle and friend described by those who know him

best. (*E.g.*, Exh. E at 1.) He is those things, and more, and most importantly he has endeavored throughout this case to remain a strong father to his three young sons.

The Court has sentenced everyone involved in this case, with the exception of Billy and Chris Meissenn. Many of these defendants attempted to downplay their culpability by characterizing Billy as a leader of the conspiracy. *E.g.*, Sentencing Mem. on Behalf of Diane Dalmy at 6, *United States v. Dalmy*, No. 3:18-cr-00021-JAM (D. Conn. May 1, 2018), ECF No. 15 (describing Lieberman as "the mastermind of the scheme"). There is no doubt that Billy played a significant role, but he was not this conspiracy's leader. While Billy directed others, he was always in a subordinate role to, and worked for, either Goldreich or Meissenn. For example, at defendant Thomas Heaphy's sentencing, the prosecutor explained to the Court that "usually Mr. Meissenn would contact Mr. Lieberman, and say, 'Hey, we need to free up 100,000 shares to be sold'." Transcript of Sentencing Hearing at 69, *United States v. Heaphy*, No. 3:17-cr-00167-JAM (D. Conn. May 7, 2018).

Billy's conduct also differed from the manipulative ways of Izzy and Meissenn. Meissenn drove the conspiracy, serving as a "surrogate father" to co-conspirators Damian Del Gado and Corey Brinson and aggressively recruiting and manipulating them and other co-conspirators. "Meissenn used unsophisticated, needy, and in some cases, fatherless, men to perpetuate his criminal designs" – he is a "manipulator" who "took advantage" of others weakness and "lured" others into "doing Meisseinn's bidding." Damian Del Gado's Mem. in Aid of Sentencing at 46, 48, *United States v. DelGado,* No. 3:17-cr-00093-JAM (D. Conn. Sept. 13, 2017), ECF No. 18. *See id.* at 46–47 ("Meissenn acted as the father and brother tha[t] Mr. Del Gado never had, just as he did with Corey Brinson.").

Given these differences, Billy and the Government agreed to a 3-level enhancement for his role in the offense as a manager or supervisor, not the 4-level enhancement reserved for

organizers or leaders of the conspiracy.  *See* U.S.S.G. § 3B1.1(a).  Moreover, commensurate with his culpability, Meissenn's criminal earnings from this conspiracy amounted to $4,398,155.80, approximately 400% of Mr. Lieberman's gain.  Mr. Lieberman's earnings were 14.8% of the conspiracy's total gains – Meissenn's was more than half.

Mr. Lieberman respectfully requests that the Court impose a non-Guidelines sentence that is substantially below the advisory Guideline range.  Mr. Lieberman maintains that such a sentence is sufficient, but not greater than necessary, to serve the purposes of sentencing in this case.  We submit that such a substantially reduced sentence is warranted for the following reasons:



- Mr. Lieberman's lack of any prior criminal history, nonexistent risk of recidivism, acceptance of responsibility, genuine expressions of remorse and efforts toward restitution, and unwavering commitment to his family support a variance under Section 3553(a), particularly in light of the failure of the loss Guidelines to provide meaningful guidance as to an appropriate sentence;

- Although the Guidelines are only advisory, a departure from the Guidelines is warranted pursuant to U.S.S.G. § 2B1.1, cmt. 20(C) because the loss enhancement substantially

overstates the seriousness of the offense and essentially punishes Mr. Lieberman as if he
had pocketed $25 million; and

- Substantially overlapping loss-related and fraud-inherent enhancements unduly magnify
the sentence.

While we believe that each of these reasons warrants a substantial reduction, we
respectfully submit that the combination of these factors most certainly does.

## Background

There was never a doubt that Billy would be pleading guilty in this case. ███████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Billy did
not put the Government to the burden of preparing this case for indictment by a grand jury.
Instead, Billy waived indictment and entered a plea of guilty pursuant to a written plea
agreement with the Government.  On May 10, 2017, Billy pleaded guilty to a two-count
Information, charging him in Count One with conspiracy to commit mail and wire fraud in
violation of 18 U.S.C. § 1349, and in Count Two with tax evasion in violation of 26 U.S.C.
§ 7201.  Billy's plea agreement is attached to the Pre-Sentence Report ("PSR").

The PSR includes the following calculation under the Federal Sentencing Guidelines:

| | | |
|---|---|---|
| Base Offense Level | 7 | (U.S.S.G. § 2B1.1(a)) |
| Loss Amount ($9.5M-$25M) | +20 | (U.S.S.G. § 2B1.1(b)(1)(K)) |
| 10 or More Victims | +2 | (U.S.S.G. § 2B1.1(b)(2)(A)(i)) |
| Sophisticated Means | +2 | (U.S.S.G. § 2B1.1(b)(10)(C)) |
| Officer or Director | +4 | (U.S.S.G. § 2B1.1(b)(19)(A)(i)) |
| Role in the Offense (Manager/Supervisor) | + 3 | (U.S.S.G. § 3B1.1(b)) |
| Acceptance of Responsibility | -3 | (U.S.S.G. §§ 3E1.1(a) and (b)) |
| Total Offense Level | 35 | |

(PSR ¶¶ 32–41.)

Given that the PSR's Guideline calculation is different than that agreed to by the parties (the result of the Probation Officer basing his calculation on a higher loss number), the Probation Officer notes that the Court might consider a departure to give effect to the plea agreement's stipulation that the loss was more than $3,5000,000 but less than $9,500,000. (PSR ¶ 92.) With that departure, the total offense level is 33.[3]

Because Billy has no criminal history, he is in Criminal History Category I. Based on a total offense level of 33 and a criminal history category of I, the Guidelines call for a period of imprisonment in the range of 135 to 168 months. (PSR ¶ 95.) Billy stipulated to that Guideline range, and stands by that stipulation. Thus, there are no issues for the Court to resolve at sentencing regarding the Guideline calculation.

### Standard of Review

"The standard of review for sentencing is one of 'reasonableness.'" *United States v. Cossey*, 632 F.3d 82, 86 (2d Cir. 2011) (*quoting United States v. Booker*, 543 U.S. 220, 260–62 (2005)). "To impose a procedurally reasonable sentence, a district court must '(1) normally determine the applicable Guidelines range, (2) consider the Guidelines along with the other factors under § 3553(a), and (3) determine whether to impose a Guidelines sentence or a non-Guidelines sentence.'" *Id.* (*quoting United States v. Villafuerte*, 502 F.3d 204, 206–07 (2d Cir. 2007)).

As the Court is well aware, following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines are now advisory. "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original).

---

[3] The Government has indicated that it intends to ask the Court to give effect to the loss calculation in the plea agreement.

7

While "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," the Guidelines are merely the "starting point and the initial benchmark[,] . . . not the only consideration." *Gall v. United States*, 552 U.S. 38, 49 (2007). Rather, the Court "must consider all of the § 3553(a) factors" and "must make an individualized assessment based on the facts presented." *Id.* at 49–50. In imposing a sentence, the factors in 18 U.S.C. § 3553(a) must be considered. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Ultimately, the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. *See* 18 U.S.C. § 3553(a).

"[D]istrict courts enjoy considerable discretion in identifying the grounds that can justify a non-Guidelines sentence." *United States v. Jones*, 531 F.3d 163, 172 (2d Cir. 2008). The Court may, for instance, "vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101 (quotation marks and citation omitted). In exercising this discretion, district courts cannot presume that the advisory Guidelines range is reasonable. *See Rita v. United States,* 551 U.S. 338, 351 (2007). In fact, even on appellate review, there is no presumption of reasonableness for the Guidelines range. *See United States v. Fernandez*, 443 F.3d 19, 28 (2d Cir. 2006). Accordingly, "the amount by which a sentence deviates from the applicable Guidelines range is not the measure of how 'reasonable' a sentence is." *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (citing *Gall*, 552 U.S. at 46–47); *see also United States v. Ovid*, No. 09-CR-216 (JG), 2010 WL 3940724, at *1 (E.D.N.Y. Oct. 1, 2010) ("Indeed, in some cases the fair sentence can drift quite far away from the advisory range, which is, after all, but one of eight factors the sentencing judge must consider.").

In short, *Booker*, and later *Kimbrough* and *Gall,* have largely restored the district court's traditional role in sentencing, namely, to evaluate each defendant on an individualized basis,

8

rather than to mechanically apply an abstract set of rules. *See Jones*, 531 F.3d at 182; *United States v. Relgado*, 518 F.3d 143, 146 (2d Cir. 2008) (*per curiam*).  Guidelines ranges are no longer presumed reasonable, federal sentencing is based on individual assessments, "extraordinary circumstances" are no longer required to justify a sentence outside the Guidelines' advisory range, and rigid mathematical formulas to determine whether a variance from the Guidelines' sentence range is justified are discouraged. *Gall*, 552 U.S. at 47. The Court must "consider all of the 3553(a) factors" and "must make an individualized assessment based on the facts presented." *Id.* at 49–50.

**Discussion**













**II.    A Non-Guidelines Sentence is Fully Warranted in Light of the Sentencing Factors Set Forth in 18 U.S.C. § 3553(a).**

The overarching consideration for the Court at sentencing is found in the Parsimony Clause, which provides that the Court "shall" impose a sentence "sufficient, but not greater than necessary, to comply with the purposes [of sentencing] set forth in 18 U.S.C. § 3553(a)(2)." *See Kimbrough*, 552 U.S. at 101.  Section 3553(a)(2) describes the goals of sentencing as: "(A) to reflect the seriousness of the offense; promote respect for the law, and provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner."

"Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable.  But where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences." *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006).

There is no denying the seriousness of Billy's conduct.  But Billy's history and character lead to one conclusion – the crime to which he pled guilty is in stark contrast to other aspects of his life involving fulsome contributions to his family and friends.  There is simply no doubt that without his having met Izzy Goldreich after he moved to New York in the midst of the financial crisis, Billy Lieberman's life would have remained uneventful, successful and lawful.

Mr. Lieberman stands by his plea; he acknowledges his guilt, and nothing in this section is intended to diminish the wrongfulness of what he did. It was a knowing and willful violation of law and ultimately involving harm to many hundreds of victims. However, ███████████ ████████████████████████████ Billy's lack of any criminal history, nonexistent risk of recidivism, full acceptance of responsibility, genuine efforts toward restitution, and roles as employer of a fledgling business and father and provider for three young sons are all highly relevant to the Section 3553(a) factors.[4]

Mr. Lieberman respectfully requests that the Court independently evaluate the Section 3553(a) factors and impose a non-Guidelines sentence substantially below the Guidelines range. Such a sentence will adequately punish Mr. Lieberman for his criminal conduct, deter others from committing similar crimes, serve the community's interests, and effectuate the payment of restitution to victims.

A.     *Mr. Lieberman's History and Characteristics Warrant a Non-Guidelines Sentence Substantially Below the Guidelines Range.*

In determining an appropriate sentence, the Court must examine the history and characteristics of the defendant. 18 U.S.S.G. § 3553(a). In so doing, the defendant's "immediate misconduct" must be "assessed in the context of his overall life hitherto" with credit given for "the good he has done." *Adelson*, 441 F. Supp. 2d at 513–14. Weighing Mr. Lieberman's misconduct in this case against the blameless life he has otherwise led, and the good he has done, demonstrates that a sentence reflecting a substantial downward variance from the Guidelines range is sufficient but not greater than necessary to serve the purposes of sentencing in this case.

---

[4] In fact, the Probation Officer noted that because Billy "has no prior convictions and has never previously served a term of imprisonment," the Court "might wish to consider whether imposition of a sentence within the advisory guideline range would be more than necessary to accomplish the purposes and goals of sentencing detailed at 18 U.S.C. § 3553(a)." (PSR ¶ 94.)

Billy Lieberman was born in 1976 and grew up in a loving home outside Toronto, Canada, the son of Jack and Lynne Lieberman. (PSR ¶ 49.) Billy lived with his parents until the age of 19, when he left home to attend school at the University of Western Ontario in London, Canada. (*Id.*) Billy earned a post-graduate certificate in public relations from Seneca College. (*Id.* ¶ 50). After working for an international company based in Belgium, Billy lived in Toronto for several years, during which time he worked productively, and lived for extended periods of time and developed a close relationship with his elderly grandmother, to whom he served as a caregiver. (*Id.*; *see* Exs. E, J & M.) In 2007, Mr. Lieberman attended and received a graduate degree from the Hult International Business School in Boston. (PSR ¶ 51.)

Billy's mother described Billy as a "hard worker" and "good student" who "never shirked his duties. At times, he had to give up some events due to a conflict with his part-time job, and he did so because he knew there were others counting on him." (Exh. J at 1.)

Billy's brother, Jonathan, wrote:

> Billy is my older (and only) brother by approximately three years and we lived together until he went away to study at university. We also spent most summers together at camp and later with our grandmother in Toronto. Since then, despite always living in different cities we have remained close and were each other's best man at our respective weddings. As work, life and families have taken each of us to various locations around the world, he has opened his home to my family and I on numerous occasions and has often visited me as well. He is kind, generous, and always going the extra mile to put family and friends first. As I was a shy kid and often struggled being away from my parents at summer camp, Billy was always looking out for me and making sure I was OK. There's no question he is unique; he is always quick with a joke, light-hearted and boisterous, in many ways the opposite to my introverted and quiet personality. Over the years, I have admired the strong relationships he has maintained with his group of friends by being caring, loyal and thoughtful, and I now see these same qualities in him as a father.

(Exh. H.)

Billy's friends and family also noted special qualities in Billy, exemplified by his care of his elderly grandmother. Billy's long-time friend, Naomi Strasser, wrote about their friendship

and Billy's care of his grandmother:

> The more we interacted, the more our friendship grew. He was educated, curious, and had done interesting things that brought different perspectives into our conversations. He spoke reverently about his parents and brother and like most smart, young people talked about his ambitions to embrace a career that was fulfilling and raise a family. He was funny. He was nice. He disliked when people behaved inappropriately or treated others disrespectfully. We had an acquaintance who, in our opinion was acting immorally. It bothered him. It is for this reason that I find it difficult to reconcile that my friend Billy Lieberman is in the position he is in today.
>
> Billy's grandmother lived around the corner from me, and he would visit her regularly. As she aged and required more care, Billy moved in with her. It struck me as an incredibly unselfish thing for an independent young man to do, but he didn't think twice about it. Living so close by, he would often stop by my house and spend hours kicking a soccer ball or playing catch in the yard with my then young son and his friends. He would listen to my children tell "knock knock jokes" long after most people would have lost patience. He gave them funny nicknames. They would light up when they saw him and would be disappointed if he didn't stay for dinner. I knew he would be a loving and attentive father one day.

(Exh. N at 1.) Brandon Rosen, a close friend of Billy's for over 30 years, wrote:

> As a younger man, William was always very close to his brother Jonathan and his parents Jack and Lynn. When William moved to Toronto, rather than live alone, on his own accord, moved in with his grandmother, Eunice, to become her caregiver. For several years, William took excellent care of Eunice, forging a beautiful bond that I know they both cherished. He helped her in her daily life, took care of the house and without question improved her quality of life during those years. I'll always remember going to see William at the house and seeing how truly happy Eunice was to have him there. We had many good laughs together.

(Exh. M at 1.)

After completing graduate school, Billy moved to New York with "no job and no money" in order "to figure things out during the financial crisis." (PSR ¶ 51.) Billy hoped to find work and earn an honest living.[5] Not long after arriving in Manhattan, broke and desperate, Mr. Lieberman had the misfortune of meeting Israel "Izzy" Goldreich, and was eventually drawn

---

[5] The PSR notes that after Mr. Lieberman moved to New York, he worked odd jobs just "to help himself survive." (PSR ¶ 70.) This is not correct, and should have been the subject of a PSR objection. Billy lived on savings until Izzy started paying him.

in to Goldreich's various schemes to defraud investors. (*Id.* ¶ 102.) Tellingly, when asked by the Probation Officer if there was anything about his life that he would change, Mr. Lieberman responded: "meeting Chris Meissen and Izzy Goldreich and working for them." (*Id.* ¶ 61.)

Billy initially did what Izzy directed – he issued press releases, opened bank accounts and served as an officer of the various companies involved in this case – and for a time was not getting paid. Perhaps out of his naïveté, Billy initially believed he was working with "real" companies with real operations and he bolstered that belief with trips to Chile and by doing things like hiring lawyers and accountants. But, as Billy has freely admitted, he eventually became a knowing participant in Izzy's and later Chris Meissenn's fraudulent conduct. After his falling out with Izzy in 2013, Billy was recruited by Meissenn, described in other submissions in this case as a "manipulator." From that point forward, Billy operated under Chris's direction.

Izzy and Meissenn both recognized Billy's weaknesses and took advantage of them. As Billy's father recognized in his letter to the Court, "Billy's weaknesses were exploited in his zeal to find a job in the securities industry as he had no job and no money. He was naïve and impressionable." (Exh. G at 2.) Or, as the friend who gave Mr. Lieberman a place to stay when he first moved to New York put it, she "thought Izzy was a little shady, but Billy is a naïve Canadian, who thinks everyone is great when he meets them." (Exh. P.) Letters of support written by friends without personal knowledge of Goldreich or Meissenn also shed light on the personality qualities that made Mr. Lieberman particularly susceptible to the influence of these men. These letters describe a "naïve" person with a "'Pleaser' personality" and a dangerous "eagerness to please people." A friend of more than 25 years wrote as follows:

> Billy is a very ambitious person. I believe Bill's "friends" recognized that fact and used it to manipulate him into doing things that he would not have done normally. I also believe that Bill was caught up in the moment and that his eagerness to please people and fit in with these people (who certainly appeared to be very successful) allowed them to take advantage of his "Pleaser" personality.

(Exh. B.)  As another life-long friend recognized, Billy's "biggest mistake was in trusting the people he became involved with."  (Exh. L.)

Billy's mother recognized that Billy, when "introduced to someone who needed a hard worker," had a tendency to "put his faith in that someone who he thought was fantastic in the hopes that it would lead to success."  (Exh. J at 3.)  Billy "would blindly put a lot of faith in the person that hired him, and wanted to please that person so that he or she would be thought of as a great employee doing a great job.  This pattern was repeated over and over."  (*Id.*)  When Mr. Lieberman moved to New York, his mother was concerned that "history was repeating himself; that he had assumed a supporting role to an individual or group that he had once again put his faith in to provide him work and what he felt were opportunities."  (*Id.*)

Billy's letter describes how he came to New York, hardly knowing anyone, and soon found in Izzy Goldreich a "big brother," "mentor," and "guardian" and "protector," and how after Goldreich introduced him to Meissenn, Billy again found himself "falling into the little brother role" and saw in Messeinn a "new mentor" and "protector."  (Exh. A at 1–3.)  Billy writes about how he dreamed about "leaving and starting over" but felt trapped, to such an extent that he felt a "huge relief" when his criminal life came to an abrupt but ultimately welcome end.  (*Id.* at 2, 3.)

Almost two years ago, Billy's life came crashing down around him.  On July 13, 2016, federal agents knocked on his door at home, and he was questioned for seven hours.  ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  At that time, Billy's wife, Erica, was pregnant with twins, and this case created intense pressure for Billy, Erica and their young family.  Eventually, Erica filed for divorce, and Erica's family – Billy's in-laws – shunned

him. And while Billy's parents showed their love and support, they made it clear to Billy "that we did not now nor would we ever condone his poor decisions." (Exh. J at 4.)

Clearly, Billy's network of friends is large, and many of his friends – some life-long friends – have written of their love and support for him. Billy's supporters include friends who recall their first conversation with Billy in kindergarten (David Gauldie), friends who invited him to participate in their weddings (Gauldie, the Goodmans), and long-time friends from school and sleepaway camp (Lance Richter, Brandon Rosen, Daniel Warren, Michael Kroll, Danny Goodman).

Many of these friends recall special acts of friendship for which Billy expected nothing in return. For example, Daniel Warren described how Billy "spent hours brainstorming ideas" to help his struggling business simply out of desire "to help support a friend," and how Billy has taken on these positive "characteristics in his role as husband and father." (Exh. R.) Lance Richter wrote how Billy "holds his old friends in the highest of regards and is always thinking of others." (Exh. L.) The Goodmans wrote:

> Billy is the kind of friend who makes sure that he keeps his group of friends connected. He is the first to let one friend know when another friend has great news to celebrate or is in crisis. Whenever we have needed a friend Billy has always been there for us.
>
> As soon as Billy and Erica had their first son we were impressed by how involved and dedicated he was. No matter what, family was his main priority. Even though we were separated by distance (Billy and his family living in Florida and our family living in Thornhill) he never let a milestone or proud father moment go by without relaying a story, sending a picture, or sharing a video. Then when his twins were on the way this care and compassion for his children continued.

(Exh. E at 1.)

Mr. Lieberman's unconditional devotion to his family—both immediate and extended— is a theme that is present in almost all of the letters of support submitted to the Court in this

22

matter.  By all accounts, Mr. Lieberman is a "caring, hands on and dedicated father" to his three children Charles (3), Alexander (1) and Oliver (1), "dedicate[ed] to being the best possible father he could be."  (*See, e.g.*, Exhs. L & R.)  Billy's life-long friend, Jeff Goldenberg, wrote that he has known Billy since the day he was born, and that Billy has always "been a family man, focusing his time and energy on bringing up his kids and building a warm and welcoming home for them."  (Exh. D.)

In light of the requirement that the punishment be no more severe than necessary, we submit that the damage to Mr. Lieberman's three innocent sons should be minimized as much as possible.  Mr. Lieberman's absence will have a profound effect on his entire family emotionally. *See Untied States v. Lehmann*, 513 F.3d 805, 809 (8th Cir. 2008) (upholding downward variance for defendant in part because defendant's minor child would experience negative emotional effects if defendant was imprisoned); *United States v. DeRiggi*, 893 F. Supp. 171, 184 (E.D.N.Y. 1995) (awarding downward departure for defendant convicted of bribery whose incarceration affected his emotionally unstable son and financially burdened the family).  Family ties and responsibilities are a recognized ground for both a Guidelines departure and a non-Guidelines variance.  *See* U.S.S.G. § 5H1.6; *United States v. Husein*, 478 F.3d 318, 329–30 (6th Cir. 2007) ("family circumstances can form the basis of either a Guidelines-authorized departure or a non-Guidelines, § 3553(a)-based departure, also known as a variance"); *United States v. Milikowsky*, 65 F.3d 4, 7 (2d Cir. 1995) ("Among the permissible justifications for a downward departure . . . is the need, given appropriate circumstances, to reduce the destructive effects that incarceration of a defendant may have on innocent third parties.").

It also cannot be overemphasized that Mr. Lieberman has no criminal record. Mr. Lieberman's conduct, however harmful, amounts to a contained series of events that stand in glaring contrast to an otherwise law-abiding life.  *See Adelson*, 441 F. Supp. 2d at 513–14

("[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance."); *United States v. Suarez-Reyes*, No. 8:12CR67, 2012 WL 6597814, at *7 (D. Neb. Dec. 18, 2012) ("This is [defendant's] first offense . . . in his otherwise law-abiding life. He is employed and making restitution.").

Mr. Lieberman fully recognizes the harm his conduct has caused to the many victims and the seriousness of the offense.  Nonetheless, the fact that Mr. Lieberman's actions are in stark contrast to the life he has otherwise led—and strives to lead—weighs in favor of imposing a non-Guidelines sentence.

      B.       *A Sentence Substantially Below the Guidelines Range is Sufficient in Light of the Nature and Circumstances of the Offense.*

Mr. Lieberman has pleaded guilty to participating in a conspiracy to commit mail and wire fraud and for tax evasion.  These are serious offenses involving Billy's knowing and willful participation in a "pump-and-dump" scheme involving the fraudulent promotion and sale of certain publicly-traded "penny" stocks to defraud investors.  Apart from Mr. Lieberman's genuine expression of remorse for participating in this conduct, the Court must evaluate the nature and circumstances of Mr. Lieberman's offense conduct in determining an appropriate sentence.  *See* 18 U.S.C. § 3553(a)(1).  Toward that end, there are a few considerations that we respectfully request the Court to consider, and that weigh in favor of a lesser, non-Guidelines sentence.

First, as discussed above, Billy was not the leader of the conspiracy, and joined it after other participants were already fully engaged in the fraud.  *See, e.g.*, Gov't Sentencing Mem. at 26, *United States v. Dalmy*, No. 3:18-cr-00021-JAM (D. Conn. May 7, 2018), ECF No. 16 ("By the time Mr. Lieberman was installed as a straw officer of Mammoth in September 2009,

24

Ms. Dalmy had already been writing fraudulent opinion letters for the control group for months."). While Billy freely acknowledges that he gradually assumed a large role in the conspiracy, he was always in a subordinate role to Goldreich and Meissenn. Reflecting his position at the top of the pyramid, Meisseen was enriched by the scheme; whereas Mr. Lieberman earned $1.2 million, Meissenn earned more than $4 million.

Another consideration relates to the venality of the offense conduct. Billy did not act as the "manipulative con man" the way Meissenn did. Corey Brinson described how Meissenn acted in this role, paying him $2,500 for a $500 zoning matter, and telling him to "keep the difference in case he needed Corey to handle other matter," in order to "draw him into Meissenn's web of deceit." Corey J. Brinson's Mem. in Aid of Sentencing at 6, 8, *United States v. Brinson*, No. 3:17-cr-0009-JAM (D. Conn. Mar. 31, 2017), ECF No. 18. Through their counsel, Brinson and Del Gado described Meissenn as preying on them and acting as a surrogate father or brother. *See* Damian Del Gado's Mem. in Aid of Sentencing at 46–47, *United States v. DelGado,* No. 3:17-cr-00093-JAM (D. Conn. Sept. 13, 2017), ECF No. 18 ("Christian Meissenn saw [Del Gado's] neediness and took advantage of it. Meissenn acted as the father or brother tha[t] Mr. Del Gado never had, just as he did with Corey Brinson."). Indeed, at Del Gado's sentencing, his counsel described his client's relationship with Meissenn this way:

> Mr. Meissenn, in Mr. Del Gado's mind, is the older brother or father figure that he lacked   Mr. Del Gado was recruited for this crime by Mr. Meissenn, I would say even groomed for it. Meissenn visited Mr. Del Gado almost every weekend when he was in prison. He paid Mr. Del Gado's legal fee in his prison case. He visited Mr. Del Gado at the lowest point in his life when he wasn't getting letters even from his mother. He praised him when he was in jail for not cooperating, told him he was the kind of guy that Mr. Meissenn could trust when he got out and that he would help him when he got out. Damian loved and admired Mr. Meissenn and felt indebted to him. But as we clearly now know, this was not a balanced relationship. Mr. Meissenn turned on Mr. Del Gado to save his own skin and agreed to cooperate against him.

Transcript of Sentencing Hearing at 67–68, *United States v. DelGado*, No. 3:17-cr-00093-JAM

(D. Conn. Sept. 27, 2017), ECF No. 31.  On the other hand, when Diane Dalmy's counsel

claimed that she was Mr. Lieberman's "patsy," counsel for the Government clarified that

although there was a "deep-seated and real affection" between Billy and Dalmy, Lieberman was

*not* "exploiting her affection for him" or "pulling the wool over her eyes."

This is not to dispute Mr. Lieberman's significant wrongdoing and culpability.

Billy fully acknowledges that he was aware of the nature and extent of the scheme and that he

worked at times as a manager and supervisor.  He only asks the Court to recognize that he was

not the scheme's leader or the master manipulator that was Meissen.

Second, and perhaps most notably, Mr. Lieberman recognized he made a terrible error,

promptly took responsibility for his error and has done everything in his power to make up for it.

When first contracted by the agents, Billy demonstrated early and complete acceptance of

responsibility for his conduct, confirming his remorse and his respect for the law, the

Government and this Court.   Billy's actions are less egregious than those of Brian Ferraioli and

Thomas Heaphy, the "serial fraudsters" who began another scheme even after Ferraioli learned

that he was a target of this investigation, twice defrauding some of the same victims from the

first scheme.  *See United States v. Ferraioli*, No. 3:18cr27 (JAM); *United States v. Heaphy*,

No. 3:18cr32 (JAM).  Del Gado, although not branded a "serial fraudster," unlike Mr. Lieberman

had a prior federal conviction stemming from a similar stock swindle.  And whereas Brinson and

Dalmy, who flagrantly abused their positions as attorneys, maintained even until the day of their

sentencing that they were "willfully blind" and did not know the true extent of the scheme, Billy

has fully accepted responsibility for his role in the conspiracy.  *See* Transcript of Sentencing

Hearing at 66, *United States v. Brinson*, 3:17-cr-00009-JAM (D. Conn. Apr. 13, 2017), ECF No.

31 ("I didn't think any of these people were losing any money."); Corey J. Brinson's Mem. in

Aid of Sentencing at 10, *United States v. Brinson*, No. 3:17-cr-0009-JAM (D. Conn. Mar. 31, 2017), ECF No. 18 ("Corey was genuinely surprised to learn that Christian Messienn . . . had used him to perpetrate a multi-million dollar fraud on investors."); *id.* at 13 ("Corey did not know that Meissenn and his colleagues were cheating the investors."), *id.* at 14 ("Corey was unaware of the . . . pump-and-dump scheme on the investors."), *id.* at 15 ("Corey never intended or even understood that the investors would suffer any loss through fraud."); Sentencing Mem. on Behalf of Diane Dalmy at 9, *United States v. Dalmy*, No. 3:18-cr-00021-JAM (D. Conn. May 1, 2018), ECF No. 15 (Dalmy "turned a blind eye" to "warning signs" and "consciously avoided learning the truth"), *id.* at 18 (Dalmy "simply turned a blind eye").

Most significantly, Mr. Lieberman deeply and sincerely regrets his crimes. He has read the victim letters, and knows the damage he and others have caused. It is telling that the letters of support describes how Billy confided his sincere remorse to his friends and family.[6] For example, a former colleague wrote:

> He was forthright and honest when he told me about what he had done, and he didn't attempt to blame others, couch the truth or hide his guilt. He sensed my shock and discomfort during that conversation and calmly told me that he deserved to be punished for his actions. He was not underplay the severity of his crimes, and was not dismissive of the judicial process. He acknowledged responsibility and was remorseful. He was worried about the shame he brought his parents, his brother, his wife, his children and himself. He was emotional when he told me how genuinely sorry he is for the pain he has caused those he victimized.

(Exh. N at 2.) Billy's friends and family note that he is "remorseful," "regretful," "embarrass[ed], "disappoint[ed]," "very sorry" and "exceedingly contrite." In the accompanying letter to the Court, Billy expressed his remorse in his own words:

---

[6] (*See* Exhs. B, D–F, H–J, L–O & R–Q.)

Your Honor, I am truly ashamed of my conduct, and I am saddened for what I have done to my family and for the lies that I helped to propagate. The loss of my marriage and my family because of my actions has affected me deeply. I have a deep sadness regarding my past that I am not sure I will ever be able to overcome. I am remorseful for what investors and those who trusted me with their dreams have lost. Reading the victim impact statements has shown me what my actions have caused.

I accept full and total responsibility for destroying the hard earned savings of so many, and for this I am truly sorry. . . . I am utterly ashamed by my conduct and I will do anything to gain back the trust that I completely broke . . . . I have complete and total remorse and I am very sorry for what I have done.

(Exh. A at 4.) *See, e.g.*, *United States v. Pauley*, 511 F.3d 468, 474 (4th Cir. 2007) (downward

variance justified in part because defendant was "deeply remorseful").

Third, and as discussed in detail *infra* at pp. 35–39, the Loss Guidelines fail to provide

guidance as to an appropriate sentence in this case. This Court, as well as numerous others, have

expressed frustration at the failure of the loss guidelines to provide meaningful guidance when

determining an appropriate sentence and have noted the inequities that can result from a

mechanical application of the loss guidelines in all cases. *See, e.g.*, Transcript of Sentencing

Hearing at 143, *United States v. Litvak*, 3:13-cr-00019 (JCH) (D. Conn. July 23, 2014) (noting

the shortcomings of the loss table, which is not based on empirical evidence, and imposing a

non-guidelines sentence); *United States v. Parris*, 573 F. Supp. 2d 744, 754-755 (S.D.N.Y. 2008)

(describing the application of the loss guidelines in a financial fraud case as "a black stain on

common sense" which would result in a sentence that was "unreasonable as a matter of law.").

Additionally, by placing a disproportionate emphasis on loss, the fraud guidelines ignore

the other required sentencing factors that are more probative of culpability and the need for

punishment. *See, e.g.*, *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004)

(Lynch, J.) (criticizing the loss guidelines for placing undue significance on the single factor of

loss which is "a relatively weak indicator of the moral seriousness of the offense or the need for

deterrence"). Thus, by "effectively ignor[ing] the statutory requirement that federal sentencing take many factors into account" the fraud guidelines "effectively guaranteed that many [guidelines] sentences would be irrational on their face." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012).

The shortcomings of the fraud Guidelines and the resulting inequity in their application are readily apparent in this case. Here, the PSR notes that the offense involved in excess of $18 million in losses for which Mr. Lieberman is being held responsible. By contrast, the gain by the conspirators was approximately $8.1 million, and Mr. Lieberman personally benefitted in the amount of approximately $1 million, a significant amount to be sure. But, the Guidelines treat Mr. Lieberman the same way that they would treat an individual who simply took the entire loss and put it in his pocket—*i.e.*, as if Billy pocketed just under $20 million. As this Court has previously recognized, the loss table's failure to reflect this difference renders it of little use when determining an appropriate sentence. *See* Transcript of Sentencing Hearing at 143–44, *United States v. Litvak*, 3:13-cr-00019 (JCH) (D. Conn. July 23, 2014) (imposing a non-guidelines sentence and noting that under the loss table, "a defendant who put between two and a half and seven million in his pocket would get the same loss table calculation as [a] defendant who did not do that").

Put simply, the loss Guidelines fail to provide meaningful guidance and result in a draconian sentencing range that fails to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a). As such, a substantially reduced sentence is appropriate here.

C.    *A Sentence Substantially Below the Guidelines Range Will Promote Respect For the Law and Provide Just Punishment.*

In pleading guilty to two felonies and immediately accepting responsibility for his involvement in the offense, Mr. Lieberman has shown respect for the law. And Billy Lieberman

29

has already been severely punished. This prosecution has had a dramatic effect on Billy's life and a great impact on his family. This prosecution has been incredibly painful, embarrassing, humbling, and taxing. In a very real way, Billy and his family have already served a very substantial sentence of personal turmoil, uncertainty and suffering.

Billy's life has been forever changed. He let down his family, especially his wife and three young sons. Letters from relatives and friends indicate that the last two years have severely strained Billy's relationship with his wife. (*See* Exh. P ("Billy has a future ex-wife as well as an extensive side of in-laws who have punished & imprisoned him ever since the FBI knocked on his door over two years ago.").) Ultimately, Billy's marriage has not withstood this strain – on April 10, 2018, Mr. Lieberman's wife filed for divorce. As a result, the stability of Billy's family is now very much at risk. *See United States v. Cox*, 271 F. Supp. 3d 1085, 1090 (S.D. Iowa 2017) (granting variance after defendant presented evidence that she was the caretaker for two of her three children in light of the negative effects of a parent's imprisonment on children and families).

Apart from these very personal consequences of his conviction, Billy has now been branded a felon. Billy has been shunned by family and friends, and his reputation in his community irreparably damaged. These consequences alone represent significant punishment. *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 194 (E.D.N.Y. 2016) (imposing non-Guidelines, non-incarceratory sentence where defendant has already been "sufficiently punished" by "collateral consequences" she will face as a convicted felon); *United States v. Myers*, 353 F. Supp. 2d 1026, 1031 (S.D. Iowa 2005) (noting the stigma associated with a conviction and being known as a criminal by family, friends and society is "no small punishment"). Prior to the introduction of the Guidelines, judges recognized that consequences of a white-collar conviction may be "sufficiently frightening to serve the major end of deterrence" without requiring a judge

to impose an arbitrarily harsh sentence as recommended by the Guidelines. *See United States v. Bergman*, 416 F. Supp. 496, 502 (S.D.N.Y 1976).

These collateral consequences of Mr. Lieberman's prosecution are, no doubt, of his own making, and we do not mean to suggest otherwise. But they reveal a man who has been heavily punished already, a fact that would justify the Court in departing from the Guidelines. Despite all his missteps, Mr. Lieberman continues to push forward. He is coping with the consequences of his plea and remains hopeful about his ability to obtain work and live a self-sufficient life. Since pleading guilty, Billy has worked hard to provide for his family and to provide restitution for his victims. *See United States v. Marsh*, 820 F. Supp. 2d 320, 355 (E.D.N.Y. 2011) (non-Guideline sentence imposed where defendant "has strong family ties and has made continuing efforts to support them through lawful employment"). Mr. Lieberman has started a plastic recycling business in South Florida and has contracted with Florida Light and Power, Waste Management Corp., and other industrial companies to recycle materials that would otherwise end up in landfill. Billy's business partner related that "[i]n the first year of the business he did almost two hundred thousand dollars in sales operating by the seat of his pants" and "has plans here to continue to build this and build big." (Exh. K at 2.) Mr. Lieberman's relationships are central to his business accounts and the financial success in his business. (*See* PSR ¶ 7; Exh. G.) Although it is a fledgling company, it has potential, and has enabled Billy and his family to put money aside for the victims of the offense. Indeed, Billy has established an account at GoBank, and this account now holds $12,200.00 in potential restitution funds.

As one long-time friend wrote: "Ever since he confessed he has focused on one thing – making sure his family is protected and secure. He has started a business that leverages the experience in his family (predominantly his father). This business is growing and employing

people who have families in Florida." (Exh. O.)  Billy's mother also informed the Court that

Billy "Billy has been working hard to establish a business that would support his family" and "is

working nights and week-ends in order to get the job done." (Exh. J at 5.)  Billy's imprisonment

would not only have dire consequences on his immediate family, but would also punish the

employees of his small business who depend on him for their livelihood.  *See Milikowsky*, 65

F.3d at 8 ("While we agree with our sister circuits that business ownership alone, or even

ownership of a vulnerable small business, does not make downward departure appropriate . . .

departure may be warranted where, as here, imprisonment would impose extraordinary hardship

on employees."); *United States v. Somerstein*, 20 F.Supp.2d 454, 460 (E.D.N.Y. 1998)

(upholding downward departure based on a combination of factors, including the impact

imprisonment would have on defendant's business and its employees).

In light of the significant impact that a period of incarceration would have on

Mr. Lieberman, a first-time offender, and his family, both emotionally and financially, a sentence

substantially below the Guidelines range is sufficient but not greater than necessary to provide

for just punishment in this case and promote respect for the law.

> D.     *A Sentence Substantially Below the Guidelines Range is Sufficient to Provide Adequate Deterrence.*

> i.     **General Deterrence**

A sentencing court must also consider the need for the sentence imposed to "afford

adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).  Here, any sentence

involving a term of incarceration will have a substantial deterrent effect on the public.  As courts

and commentators have recognized, in white-collar cases, the publicity and stigma associated

with conviction serves to deter similar crimes, even when a non-custodial sentence is imposed.

*See, e.g., United States v. Robinson*, 13-436 JLL, 2014 WL 1400197, at *8 (D.N.J. Apr. 9, 2014)

(concluding that in a white-collar case "probation best addressed the need for deterrence");
*Adelson*, 441 F. Supp. 2d at 515 ("there is a considerable evidence that even relatively short
sentences can have a strong deterrent effect on prospective 'white collar' offenders.")
*See also United States v. Shokler*, No. 12-CR-415, 2013 WL 4851695, at *3 (E.D.N.Y. Sept. 10,
2013) (in imposing non-guidelines sentence in tax fraud case, finding that "[g]eneral deterrence
is satisfied by the sentence imposed" because "Defendant will probably spend the remainder of
his life making payments for restitution").

      **ii.**    **Specific Deterrence**

The need for specific deterrence is also a factor the Court must consider in fashioning an
appropriate sentence. *See* 18 U.S.C. § 3553(a)(2)(B). Respectfully, there is no such need in this
case.

Mr. Lieberman is 42 years old, a father, is in Criminal History Category I with zero
criminal history points, has ▮▮▮▮▮▮▮ expressed remorse, is a non-violent offender, has not
recently used illegal drugs, has a graduate degree, and has prospects for employment post-
incarceration – all factors that result in a low rate of recidivism, mitigate strongly in favor of
lenity, and are important factors not considered in the Guidelines' calculus. *See, e.g.*, *United
States v. Jenkins*, 854 F. 3d 181, 192 (2d Cir. 2017) (citing research documenting that "offenders
with a Criminal History Category I between ages 41 and 50 have a 6.9% recidivism rate, as
opposed to a 29.5% recidivism rate for Category I offenders under 21"). There is no reason to
believe that a significant term of incarceration is necessary to prevent Mr. Lieberman from again
engaging in a penny stock fraud scheme. Indeed, the non-existent risk of recidivism present here
favors a variance from a Guidelines sentence. *See United States v. Smith*, 275 F. App'x 184, 187
(4th Cir. 2008) (downward variance justified in part because of low risk of recidivism); *United
States v. Roth*, No. 05 CR 792-5, 2008 WL 686783, at *3 (N.D. Ill. Mar. 11, 2008) (downward

departure due, in part, to defendant's sincere remorse and absence of criminal history, all indicating no threat of recidivism).

Mr. Lieberman will be paying restitution in this case for the rest of his life, another reason why he is not likely to risk another conviction by reoffending. *See United States v. Nagel*, No. CR-10-511, 2011 WL 4025715, at *4–*5 (E.D.N.Y. Sept. 9, 2011) (in imposing non-guidelines sentence where "defendant will be saddled with restitution payments, effectively for the rest of his life," stating that "[s]pecific deterrence is achieved through extensive restitution" as "[t]hose payments will have a continuing deterrent effect.").

A shorter sentence, of course, will help Mr. Lieberman continue with his recycling business, or to obtain other or additional employment and increase the number of years that he can earn toward restitution. *See United States v. Menyweather*, 431 F.3d 692, 702 (9th Cir. 2005) (probation appropriate because it made the defendant "better able to provide restitution to the victims"); 18 U.S.C. § 3553(a)(7) (court shall consider "the need to provide restitution to any victims of the offense"). Mr. Lieberman can do better for his victims, and his family, if non-incarcerated and employed.

Mr. Lieberman has already suffered significant consequences as a result of his conviction. The threat of months or years away from his children is punishment of itself. A non-Guidelines sentence substantially below the Guidelines range will more than adequately serve the goals of deterrence, particularly since the need to deter Mr. Lieberman specifically is non-existent.

       *E.*     *A Sentence Substantially Below the Guidelines Range is Appropriate to Avoid Unwarranted Sentencing Disparities.*

Imposing a non-Guidelines sentence would also fully comport with "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(5). As noted above, sentencing courts

have increasingly realized that the fraud Guidelines are not 'helpful" in many cases and produce

sentencing outcomes that are "irrational on their face." *Gupta*, 904 F. Supp. 2d at 351;

Transcript of Sentencing Hearing at 142–43, *United States v. Litvak*, 3:13-cr-00019 (JCH)

(D. Conn. July 23, 2014).  With this realization has come a precipitous drop in the imposition of

Guidelines sentence for economic offenses.  According to the latest data from the United States

Sentencing Commission, a clear majority of defendants sentenced under Section 2B1.1 now

receive non-Guidelines sentences.  *See* U.S. Sentencing Comm'n, 2014 Sourcebook of Federal

Sentencing Statistics, Table 28 (only 46% of defendants in s 2B1.1 cases are sentenced within

Guidelines).  In this district, only about one quarter of *all* defendants receive sentences within the

advisory Guidelines range.  *Id.*, Table 26.  In light of this data, adhering to the "broken"

sentencing regime applicable to this case, *see United States v. Corsey*, 723 F.3d 366, 377–78 (2d

Cir. 2013) (Underhill, J., concurring), would only serve to exacerbate, not avoid, unwarranted

disparities.  Imposing a non-Guidelines sentence is thus fully consistent with the need to avoid

disparities under Section 3553(a).

### III.    A Downward Departure Is Warranted under U.S.S.G. § 2B1.1, cmt. 20(C) Because the Loss Amount Overstates the Seriousness of the Offense.

Section 3553(a) also requires district courts to consider the Sentencing Guidelines.

Although advisory only, the Guidelines are the "starting point" for the Court.  *Gall*, 552 U.S. at

49.  Here, this starting point is way too high.  Indeed, the Probation Officer noted that the "Court

might wish to consider whether the guideline loss [noted in the PSR] overstates the seriousness

of the offense, thus meriting a downward departure."  (PSR ¶ 91.)

The Guidelines recognize that in certain circumstances the offense level produced by the

mechanical application of the loss table in U.S.S.G. § 2B1.1 may overstate the seriousness of the

offense.  *See* U.S.S.G. § 2B1.1 cmt. 20(C).  In such a situation, the Guidelines provide that a

downward departure may be warranted. *Id.* Because a departure on the grounds that the loss

overstates the seriousness of the offense is specifically contemplated by the Guidelines, it is

considered an "encouraged basis" for departure. *See, e.g.*, *Koon v. United States*, 518 U.S. 81,

93–95 (1996).

The flaws in the fraud guideline's arbitrary base offense level and loss enhancement table

are familiar to this Court. The penalty ranges imposed by the loss table are not the product of

sound, empirical analysis, but rather, of Congress tipping the scales to increase sentencing ranges

significantly. *See Corsey*, 723 F.3d at 379–81 (Underhill, J., concurring). As the Second Circuit

recently explained in vacating a defendant's sentence after a fraud conviction, "Where the

Commission has assigned a rather low base offense level to a crime and then increased it

significantly by a loss enhancement, that combination of circumstances entitles a sentencing

judge to consider a non-Guidelines sentence." *United States v. Algahaim*, 842 F.3d 796, 800 (2d

Cir. 2006). In fact, according to the logic of the Second Circuit's remand in *Algahaim*, a district

court *must* consider whether "the significant effect of the loss enhancement, in relation to the low

base offense level, should result in a non-Guidelines sentence." *Id.*

In light of the unique factors in this case, the amount of loss results in an offense level

that substantially overstates Mr. Lieberman's culpability for the offense conduct.

The Government claims that the victims of the conspiracy suffered net losses of $18,789,364

(PSR ¶ 23) and as a result the PSR states that "the loss amount attributable to Mr. Lieberman is

$18,789,364, resulting in a 20-level increase to the base offense level for loss" and a total offense

level of 35 (PSR ¶ 80.) In the Plea Agreement, however, the Government stated its "position"

that "the loss was more than $3,500,000 but less than $9,500,000," resulting in an 18-level

increase to the base offense level for loss and a total offense level of 33. As noted *supra* at p 7

& n.3 and in the PSR, the Government has indicated that it will request a departure pursuant to *Untied States v. Fernandez* to comport with the range it previously agreed to. (PSR ¶ 95.)

Regardless of whether the loss enhancement of 18 or 20 levels, the Court should assign minimal weight to the resulting range. Either loss calculation results in a severe increase in base offense (accounting for more than 50% of the total offense level) and an irrational sentencing outcome in this case. Billy is being held responsible for the total amount of loss suffered as a result of the conspiracy, even though he personally received only $1.2 million of the conspirators' total $8.1 million gain. As many judges have noted, including Judge Gerald Lynch, the total amount of loss is a poor proxy for culpability. *Emmenegger*, 329 F. Supp. 2d at 427 ("The Guidelines place undue weight on the amount of loss involved in the fraud. . . . Had [the defendant] been caught sooner, he would have stolen less money; had he not been caught until later, he would surely have stolen more. . . . The rough magnitude of the theft is relevant to sentencing, but the particular amount stolen is not significant."); *see also Corsey*, 723 F.3d at 377 (Underhill, J., concurring) ("In my view, the loss guideline is fundamentally flawed, and those flaws are magnified where… the entire loss amount consists of intended loss").

While a significant sum, Mr. Lieberman's profits constitute a comparatively small amount given the total losses sustained by the conspiracy. In essence, the Guidelines treat Billy the same as if he had pocketed $25 million. In such circumstances, district courts have exercised their discretion to depart downward. Transcript of Sentencing Hearing at 143–44, *United States v. Litvak*, 3:13-cr-00019 (JCH) (D. Conn. July 23, 2014) (imposing a non-guidelines sentence and noting that under the loss table, "a defendant who put between two and a half and seven million in his pocket would get the same loss table calculation as [a] defendant who did not do that"); *United States v. Redemann*, 295 F. Supp. 2d 887, 897–98 (E.D. Wis. 2003) (departing downward in finding that loss amount in excess of $2 million attributed to defendant under

37

Guidelines 'substantially exceeded any fair measure of his culpability' where defendant

improperly received at most $500,000); *United States v. Forchette*, 220 F. Supp. 2d 914, 96

(E.D. Wis. 2006) (finding that "defendant's share of the proceeds was consistently minimal,

certainly in comparison to the total amount of loss. . . . [H]is 'profit' . . . was between $18,000

and $54,000.  Yet the amount of loss was $464,300, a gross disparity.").

> The Court expressed this very concern at Mr. Del Gado's sentencing:

> THE COURT:  I do have a lingering concern . . . about the fraud guidelines'
> treatment essentially on a one-to-one basis of an amount that is taken by somebody
> personally and then the amounts taken by somebody or caused a loss by somebody
> else.  I do think that there's something wrong when a guideline essentially treats
> somebody who has taken $350,000 the same as somebody who has taken $3.5
> million, perhaps a tenfold difference.  Both acts are horribly culpable, but it seems
> to me that the guidelines essentially treat them all the same, exactly the same.  And
> that's a shortcoming, in my view, of this particular guideline.  It's one thing that
> inures somewhat to your benefit here because of the fact that I think you didn't get
> $3.5 million out of the crime.

Transcript of Sentencing Hearing at 104, *United States v. DelGado*, No. 3:17-cr-00093-JAM

(D. Conn. Sept. 27, 2017), ECF No. 31.

Even considering the agreed-upon, lesser loss amount of $3.5–$9.5 million, when

combined with the other adjustments the Guidelines would put Mr. Lieberman's offense level at

33, which would ordinarily result in a sentencing range of between 135–168 months for a

first-time offender.  U.S.S.G. Sentencing Table.  That offense level is equivalent to or higher

than the offense levels for defendants convicted of violent offenses like solicitation to commit

murder (level 33, *see* U.S.S.G. § 2A1.5), or kidnapping (level 32, *see* U.S.S.G. § 2A4.1), or vile

offenses like sexual exploitation of a minor (level 32, *see* U.S.S.G. § 2G2.1).  Mr. Lieberman's

first-time, non-violent, economic crime, while serious, certainly never put anyone's life in

danger.  But the Guidelines advise a sentence that would be meted out to punish such serious and

violent conduct.  As such, the fraud Guideline is "fundamentally flawed," "valueless," "broken

[and] leaves district judges without meaningful guidance in high-loss cases" such as this.

*Corsey*, 723 F.3d at 377–78 (Underhill, J., concurring).  *See also United States v. Watt*, 707

F. Supp. 2d 149, 151 (D. Mass. 2010) (Gertner, J.); *Parris*, 573 F. Supp. 2d at 754; *Adelson*,

441 F. Supp. at 506.

## IV.     The Court Should Depart From the Guidelines Because Substantially Overlapping Enhancements Unduly Magnify the Sentence.

As part of his plea agreement, Billy Lieberman agreed to an incredibly high Guideline

range made up of several, overlapping adjustments.  Added to the significant loss enhancement

(increasing his offense level by 18 levels) are many loss-related and fraud-inherent

enhancements, which serve to overstate the true seriousness of his own conduct.  For this reason,

a downward variance is warranted.  See *United States v. Voss*, 283 F. App'x 874 (2d Cir. 2008)

(reduction permitted where two adjustments overlap); *United States v. Savin*, No. S1 00 CR

45(RWS), 2004 WL 1161323, at *7–*9 (S.D.N.Y. May 25, 2004) (granting a four-level

"cumulative effects" departure pursuant to § 5K2.0 and 18 U.S.C. § 3553(b)(1) because the

defendant was subject to "three substantially overlapping enhancements"); *see also United States

v. Jackson*, 346 F.3d 22, 26 (2d Cir. 2003) (remanding for the district court to consider departing

from the Guidelines because serial, overlapping enhancements resulted in an enhanced sentence

which the Sentencing Commission had not contemplated), *adhered to on reh'g sub nom.*

*United States v. Lauersen*, 362 F.3d 160 (2d Cir. 2004), *cert. granted, judgment vacated*,

543 U.S. 1097 (2005).

On top of an 18-level enhancement for loss, Billy is subject to further enhancements

because (1) the offense involved 10 or more victims, (2) the offense involved sophisticated

means, (3) the offense involved a violation of securities law and Billy was an officer of a

publicly traded company, and (4) Billy was a manager or supervisor and the criminal activity

involved 5 or more participants. "Even though these enhancements are sufficiently distinct to escape the vice of double counting, they substantially overlap." *Jackson*, 346 F.3d at 26 ("Most fraud schemes that obtain more than one half million dollars involve careful planning, some sophisticated techniques, and are extensive.").

There was nothing especially complex or intricate in Billy Lieberman's conduct, and the scheme was not more complex than a routine stock fraud or tax fraud. *See United States v. Tin Yat Chin*, 371 F.3d 31, 42 (2d Cir. 2004) ("sophisticated means" enhancement not warranted where fraudster used fictitious identities, established separate officers and accepted only cash payments). Even a leading proponent of the so-called "sophisticated" means enhancement in 1998 "no longer think[s] it serves any useful purpose" because "stealing really big sums inevitably involves methods the courts characterize as sophisticated means," and "serves only as a nearly inevitable 25 percent boost to already high guideline ranges." Frank O. Bowman, III, *Damp Squib: The Disappointing Denouncement of the Sentencing Commission's Economic Crime Project (and What they Should Do Now)*, 27 FED. SENT'G REP. 270, 280 (2015). Indeed, it is hard to conceive how a group of conspirators would be able to inflict $20 million in losses over a seven-year period without using sophisticated means. It is likewise hard to imagine a securities fraud scheme that does not involve at least 10 victims. As the Supreme Court stated in *Dorvee*, "adherence to the Guidelines" can lead to a result "fundamentally incompatible with § 3553(a)," based on "sentencing enhancements that are all but inherent to the crime of conviction." 616 F.3d at 186.

At Del Gado's sentencing, the Court questioned whether it was possible to have an offense involving a multi-million dollar loss—like the offense conduct at issue here –in the absence of sophisticated means: "I wonder, though, is it really possible to have an offense that involves the kind of multi-million dollar loss we have here without having . . . the absence of

sophisticated means or not having typically more than ten victims?  Certainly sophisticated

means seems to be very closely aligned here with the size of the fraud, do you think?"

Transcript of Sentencing Hearing at 88, *United States v. DelGado*, No. 3:17-cr-00093-JAM

(D. Conn. Sept. 27, 2017), ECF No. 31.

        In imposing sentence, the Court stated:  "On the overlapping enhancement question,

I think, as I've pretty much made clear in the questions I have, I do think the sophisticated means

enhancement at least so much as the guidelines count them here is disproportionate in light of the

3553 factors to how much the sentence should increase potentially here.  It's pretty close to a

two-year difference in terms of the enhancement that I don't think has got it right here."

*Id.* at 104–105.  Based on this same reasoning, the Court should grant a variance from the

Guidelines based on the overlapping nature of the sophisticated means and other enhancements,

and on the grounds that the loss and the cumulative effects of the enhancements in the PSR

overstate the seriousness of the offense as to Mr. Lieberman.

## V.     **Combination of Factors Warrants a Departure.**

        We respectfully submit that all of the reasons listed above for why Mr. Lieberman merits

a downward departure or variance should be considered together, as they cumulatively favor a

departure even if the Court is not convinced that any single factor, considered individually,

would warrant such relief.  *See United States v. Leung*, 360 F.3d 62, 72 (2d Cir. 2004)

("Where an unusual constellation of factors exists that removes any sentencing from the

'heartland' cases, district courts are obligated to consider departures even though no one factor,

standing alone, might justify an upward or downward departure."); *United States v. Rioux*,

97 F.3d 648, 663 (2d Cir. 1996) (downward departure appropriate "when a number of factors

that, when considered individually, would not permit a downward departure, combine to create a

situation that 'differs significantly from the 'heartland' cases covered by the guidelines'")

(*quoting* U.S.S.G. § 5K2.0, cmt.); *United States v. Evans*, Criminal Action No. 04-cr-138 (JCH), 2009 WL 2235882, at *2 (D. Conn. July 22, 2009) (upholding original sentence where Court departed from Guidelines based on combination of factors including rehabilitation); *United States v. Caruso*, 814 F. Supp. 382, 384 (S.D.N.Y. 1993) ("although the defendant's age, military service, medical problems, good employment record, and likely future compliance with the law might not individually justify departure, the totality of these circumstances represent ground for downward departure here, where 'several characteristics, in combination, were not adequately taken into account by the Sentencing Commission in formulating the Guidelines.'").

## Conclusion

For all of the foregoing reasons, Mr. Lieberman respectfully requests that the Court impose a sentence substantially below the Guidelines range.  A sentence reflecting a substantial downward variance is fair and reasonable in light of the facts of this case and Mr. Lieberman's unique characteristics and background and is sufficient, but not greater than necessary, to achieve the goals of sentencing under 18 U.S.C. § 3553(a).

Respectfully submitted,
WILLIAM LIEBERMAN

By:        */s/ Joseph W. Martini*
Joseph W. Martini
Federal Bar No. ct07225
WIGGIN AND DANA LLP
281 Tresser Boulevard, 7th Floor
Stamford, CT 06901
Phone: (203) 363-7603
Fax:  (203) 363-7676
Email:  jmartini@wiggin.com

### CERTIFICATION

I hereby certify that on July 2, 2018 a copy of the foregoing **Memorandum in Aid of Sentencing** was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


/s/ Joseph W. Martini