# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 3:17-cr-96 (JAM) |
| v. | |
| WILLIAM LIEBERMAN,<br>*Defendant*. | October 4, 2020 |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION FOR COMPASSIONATE RELEASE

The defendant William Lieberman has filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) citing the COVID-19 pandemic and health concerns. *See* Doc. 61. This motion should be denied. The defendant has failed to sustain his burden to show "extraordinary and compelling reasons" warranting release. Further, the factors enumerated in 18 U.S.C. § 3553(a) dictate that he complete the well-deserved prison sentence originally imposed.

**I.  BACKGROUND**

From January 2010 until July 2016, the defendant helped to run a massive investor fraud scheme that cheated thousands of victims out of millions of dollars. The defendant managed a series of shell companies and conspired with others to promote and sell junk stock issued by those companies as part of a "pump and dump" scheme. Among other things, the defendant forged paperwork to issue and unrestrict stock, wrote and signed fraudulent opinion letters in the names of various attorneys, and laundered much of the scheme's proceeds. The defendant made almost $1.2 million from the scheme and did not pay a penny in taxes. The defendant's scheme caused more than 12,000 victims to lose, collectively, nearly $19 million. The defendant's victims are real people, hardworking people, many of whom are elderly.

On May 10, 2017, the defendant pleaded guilty to a two-count information charging him with conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349 and tax evasion in violation of 26 U.S.C. § 1702. On July 13, 2018, the Court sentenced the defendant to a term of 84 months imprisonment, to be followed by three years of supervised release. Doc. 45. The Court also ordered restitution in the amount of $5,737,929, in total, for both counts, and ordered the defendant to report to prison one month later. *Id.* The defendant is presently serving his sentence at the minimum security satellite camp at the Miami (Florida) Federal Correctional Institution ("FCI Miami Camp").

On May 11, 2020, the defendant filed his first motion for compassionate release. On May 14, 2020, the Court denied the motion without prejudice because the defendant failed to show that he had exhausted the administrative remedies prior to filing. Doc. 24 ( The defendant's "motion does not reflect that he has made any request to the warden of his facility to file a motion on his behalf or that he has waited at least 30 days to file his motion since requesting the warden of his prison to file a motion on his behalf"). The defendant filed the instant motion for compassionate release on September 21, 2020, Doc. 61, and a supplemental brief on September 29. Doc. 66.

## II.    APPLICABLE LAW

Once a sentence becomes final, it can only be modified by a court pursuant to statutory authorization. *See United States v. Gotti*, 433 F. Supp. 3d 613, 614 (S.D.N.Y. 2020). The compassionate release statute, 18 U.S.C. 3582(c)(1)(A)(i), provides such authorization. A court may grant a motion for compassionate release to reduce a prisoner's sentence if "(1) he has fully exhausted his administrative remedies or 30 days have passed from receipt of his request by the Warden, and (2) [the court ] find[s], after considering the Section 3553(a) factors, that "extraordinary and compelling reasons warrant" a reduction of his term of imprisonment." *United*

*States v. Gonzalez*, No. 3:15-CR-00223 (MPS), 2020 WL 5793304, at *2 (D. Conn. Sept. 29, 2020); *see* 18 U.S.C. 3582(c)(1)(A)(i).

A court may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release."[1] *United States v. Brooker*, No. 19-3218-CR, 2020 WL 5739712, at *7 (2d Cir. Sept. 25, 2020).[2] When considering the factors set forth in 18 U.S.C. § 3553(a),

> A court must examine the same factors it did when it initially sentenced the defendant, including the nature and circumstances of the crime, the defendant's history and characteristics, and the multiple purposes of sentencing, such as providing just punishment, deterring crime, protecting the public from further crimes by the defendant, and providing the defendant with rehabilitation.

*United States v. Ferraioli*, No. 3:18-CR-00027 (JAM), 2020 WL 4284560, at *3 (D. Conn. July 27, 2020). Significantly, the defendant bears the burden of showing that his own circumstances warrant compassionate release. *See United States v. Ebbers*, 432 F. Supp. 3d 421, 426 (S.D.N.Y. 2020) (citing *United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992)).

### III. ARGUMENT

#### A. The defendant has exhausted his administrative remedies.

Before a defendant can file a motion for release, he must have "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or there must be a "lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . ." 18 U.S.C. § 3582(c)(1)(A). The

---

[1] The Second Circuit recently held in *United States v. Brooker* that the Sentencing Commission's policy statement found in U.S.S.G. § 1B1.13, which provides criteria for what constitutes "extraordinary and compelling reasons," does not apply to motions for compassionate release brought by defendants. *United States v. Brooker*, No. 19-3218-CR, 2020 WL 5739712, at *7 (2d Cir. Sept. 25, 2020).

Government does not contest that the defendant has met the exhaustion requirement. He made a request to the warden on May 18, 2020, and that request was denied. Doc. 61 at 4-6.

**B.     The defendant has failed to present "extraordinary and compelling" reasons warranting release.**

The defendant has not established extraordinary and compelling reasons that would warrant compassionate release. As an initial matter, the Government received notification from BOP that as of October 1, 2020, there were no active COVID-19 cases among prisoners or staff at FCI Miami Camp, the institution where the defendant is housed.[3] The defendant, who is 44 years old, claims that he has an autoimmune disorder and hypertension. Doc 66 at 7-9. However, in the defendant's case, these conditions, at most, *might* increase his risk of serious illness if he contracts COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited October 4, 2020). Since the outbreak of the COVID-19 pandemic, courts in the Second Circuit and in this district have concluded that "extraordinary and compelling" circumstances may exist when an incarcerated defendant suffers from health conditions that make him particularly susceptible to serious complications should he contract COVID-19. *Howell*, 2020 WL 2475640, at *3; *United States v. Hull*, No. 3:17-cr-132 (SRU), 2020 WL 2475639, at *2 (May 13, 2020).

---

[3] It is not in dispute that the defendant is presently housed at FCI Miami Camp and not the larger FCI Miami. *See* Doc. 66 at 7 n.10 ("FCI Miami consists of a minimum-security institution and a camp. Mr. Lieberman is currently housed at the camp.") As the defendant accurately states, "[t]he Federal Bureau of Prisons does not show how many of the reported COVID-19 cases occurred at the FCI versus the camp" on the BOP website. *Id.* The Government also does not dispute that there are presently COVID-19 cases at the larger FCI.

### 1. The defendant's alleged autoimmune disorder does not warrant compassionate release.

In his motion for compassionate release, the defendant first claims to have a "medical history of vascular angioedema, linked to Eurythema Multiforme Rheumatoid disease, an Immune weakening condition." Doc. 61 at 1. The defendant later claims that he has "suffered from Eurythema Multiforme Rheumatoid Arthritis, since 1993, being diagnosed at the age of sixteen." *Id.* The only support the defendant provides for his diagnosis is a positive Anti-Nuclear Antibody ("ANA") test from 2015 and letter from a Dr. Mark Levy, a Canadian primary care physician. Doc 61 at 12-13.

The defendant points to a positive Anti-Nuclear Antibody ("ANA") test from 2015 and states that the test confirmed "clinical Rheumatoid disease." Doc. 61 at 5. However, a positive test result alone does not confirm a rheumatoid disease or any other autoimmune diagnosis. "A positive ANA test result means that autoantibodies are present. In a person with signs and symptoms, this suggests the presence of an autoimmune disease, but further evaluation is required to assist in making a final diagnosis. Again, some people without disease can have a positive ANA test." https://labtestsonline.org/tests/antinuclear-antibody-ana (last visited October 4, 2002). The defendant has not provided evidence that any further evaluation was done to support an autoimmune diagnosis.

In his letter, Dr. Levy states that the defendant was diagnosed in 1993 with "Eurythema Multiforme Arthritis and Angioedema." In the letter, Dr. Levy misspells "Erythema" as "Eurythema." Doc. at 13. The doctor then states that the defendant was told by another physician that he had "autoimmune Arthralgias and Utricarial." *Id.* The Government has not been able to identify a formal diagnosis with that name. As the defendant correctly states, Arthralgias is "joint stiffness." Doc. 66 at 8. However, "Urticaria" as opposed to "Utricarial," as Dr. Levy states, is the

medical term for hives. https://www.webmd.com/skin-problems-and-treatments/guide/hives-urticaria-angioedema#1 (last visited October 4, 2020). Although Dr. Levy offers commentary on the defendant's alleged autoimmune diagnosis, it should be noted that Dr. Levy states that he last cared for the defendant in 2014, one year prior to the defendant's positive ANA test. Yet, Dr. Levy still opines on the significance of those test results.

The defendant's records from the Bureau of Prisons ("BOP") paint a different story. Since 2018, the defendant has had numerous visits with BOP medical staff. BOP provided the Government with 145 pages of medical records documenting these visits.[4] *See* Exhibits 1 and 2. Not once in the 145 pages of medical records is an autoimmune disease mentioned. What the medical records do show is that the defendant has hypertension, which is stable and controlled by medication, and a self- reported history of intermittent episodes of angioedema which respond to Claritin and prednisone. *See e.g.* Exhibit. 1 at 9. The defendant claims to have experienced "several instances of an angioedema flare during the time he has been incarcerated." Doc. 66 at 8. However, none of these flares have been documented by BOP medical staff. The defendant states that "he generally does not report the flares to Health Services as the treatment protocol is to prescribe antihistamines that he can purchase from the commissary." *Id.* The defendant's failure to seek medical treatment brings into questions the severity of the alleged disorders.

### 2. The defendant's hypertension does not warrant compassionate release.

The CDC states that "[b]ased on what we know at this time, people with [hypertension] *might* be at an increased risk for severe illness from COVID-19." https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-

---

[4] The Government previously provided these records to counsel for the defendant.

conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited October 4, 2020) (emphasis added). However, in the defendant's case, this diagnosis alone does not provide an "extraordinary and compelling reason" warranting release. As this Court recently stated in another decision,

> Although [the defendant] is correct that hypertension diagnoses have occasionally "contribut[ed] to findings of extraordinary and compelling reasons" by other courts, [] in those cases the prisoner has typically also had another serious health condition creating superordinate risk to COVID-19, resided in a BOP facility with a spreading COVID-19 outbreak, or had already served the majority of a lengthy sentence or was otherwise set to be released shortly. Moreover, in each of those cases the court determined the sentencing factors under 18 U.S.C. § 3553 weighed in favor of a sentence reduction. Those circumstances are not present here.

*United States v. Kelley*, No. 313CR0018116JAM, 2020 WL 5633263, at *4 (D. Conn. Sept. 21, 2020). Those circumstances are also not present here.

### C. The § 3553(a) factors do not weigh in favor of release.

Finally, even if the Court concludes that the defendant's medical conditions combined with the risk of COVID-19 infection may warrant compassionate release, the Court must first consider the sentencing factors in 18 U.S.C. § 3553(a). Those factors weigh heavily against early release here, particularly the need for the sentence to "reflect the seriousness of the offense," "promote respect for the law," and "provide just punishment for the offense." *Id.* § 3553(a)(2).

Although the Government previously presented the Court with its position on the § 3553(a) factors for the defendant's sentencing, there are some key points worth restating. The defendant spent

> [M]ore than six years fleecing thousands of victims out of millions of dollars. He abused his position as an officer of several publicly traded companies. He lied directly to investors in public filings, on

7

> the telephone, and in face-to-face meetings. He forged signatures and enlisted crooked attorneys to facilitate self-dealing stock transactions. He made a lot of money from his fraud, and he evaded the payment of more than $400,000 in income taxes.

Doc. 32 at 29. The defendant was motivated by greed. "Unlike many defendants who come before the Court . . . Mr. Lieberman enjoyed a peaceful, privileged upbringing. He graduated college, backpacked through Europe for six months, worked for several years, and then obtained a business degree. He had every opportunity to succeed and live a law-abiding life." *Id.* at 22-23.

"The financial and emotional toll on these victims is unquestionably the most serious aspect of this case." More than 800 of the defendant's victims took the time to submit Victim Impact Statements to the Court in advance of the defendant's sentencing. *Id.* at 18. As reflected in those statements, many of the defendant's investors lost their retirement. "A 72-year-old retiree who lost about $245,000 was forced to return to work driving a school bus." *Id.* "An 84-year-old victim who lost about $78,000 was planning to use that money to help pay for an assisted living facility." *Id.*

Following the defendant's instant motion for compassionate release, the Government wrote to and/or called the defendant's victims to solicit their positions regarding his release. Importantly, the victims were universally opposed to his release. The following are summaries of the victim statements that have been received thus far:

- Victim WW wrote: "Did everyone William Lieberman stole from get their money back? I didn't get one penny back! No one is giving me a break paying for my children's education, why should he get a break? William Lieberman is a criminal that needs to be locked-up for the full duration of his sentence."

- Victim J.S. expressed frustration and stated he has only received $20 in restitution despite being swindled out of thousands. Victim J.S. proposed that Lieberman could get early release if he pays back all of the victims or works it off. But until that time, he should stay in prison.

- Victim J.D. wrote: "The legal system is a joke. When are we getting paid[?] Stop defending criminals and pay up the money we are owed."

- Victim B.S. wrote: I believe he should serve out his sentence, the entire sentence without consideration. He had no consideration for his victims, and now his victims are asking that he receive no more thought than he gave us.

- Victim R.S. wrote: "It doesn't surprise me that a con artist is now trying to use a pandemic that has killed hundreds of thousands and robbed even more of their livelihoods, considering he attempted to do the same thing to thousands of innocent people. I thought prison was supposed to be a punishment? He, nor anyone involved in the MMTE Scam should be allowed to "get out of jail free" while others are still suffering from their actions. The victims of William's crime don't have the option to get their money back because they recently lost their job or a loved one because of COVID."

- Victim K.J. opposed his release.

- Victim F.C. wrote: "I am not in favor of releasing this inmate. He stole my money and has not repaid it. I am retired and on a fixed income. The only way I would approve of his being released because of the CV-19 is if he repays 100% of the theft of my money plus a nominal interest rate. I am in lock down in my home from CV-19 due to my age (78) and my underlying conditions, so he can stay in lockdown in prison."

- Victim K.T. wrote: " I do not support early release for any inmate due to COVID-19, let alone William Lieberman. My reasoning is: (1) There is no guarantee a release from confinement will prevent him from getting the virus. (2) He is asking for nearly four years be negated from his sentence. That is way too much to even consider. (3) He is making the presumption that he will get the virus if he remains in confinement. That is not a foregone conclusion. (4) If he does contract the virus, he can be treated and be allowed to recover while remaining under Federal Corrections control. (5) The likelihood of a viable vaccine and/or the low level threat of the virus in the near future is highly probable. The concern level will dissipate soon. (6) Contraction of COVID-19 is not a death sentence. The death rate is extremely low and concern level is exacerbated by media hype in a Presidential election year."

- Victim M.K, who is in the military and currently deployed overseas wrote: "William Lieberman had no regard for the financial impact to his victims my self included. He should in no way be allowed to be released early. Releasing him early would be a great injustice to the victims in this case."

- Victim D.S. who also made a statement at the defendant's sentencing, wrote: "1) He is a con man. Seeing this C[o]rona 19 virus as a potential for his benefit & release is totally consistent with his personality. It's has too much potential to work to his benefit to NOT try to use it as an excuse for his release. . . . This man swindled MILLIONS of dollars from thousands of people. And he wants release in two years when sentenced to ONLY seven. . . .He is a chameleon who can change to fit in the circumstances whether it's swindling money or using the court system...always to his benefit. . . . Please. Please make him learn.

9

Make him stay in prison. Make him learn that he cannot con & swindle his way through life without discomfort.

Finally, Victim M.M. took the time to speak to the Government and explained how the defendant stole his entire 401(k). Before the call ended, Victim M.M. powerfully stated, "Lieberman wants compassionate release, but he didn't show his victims any compassion."

## IV.  CONCLUSION

For the foregoing reasons, the defendant's request should be denied.

> Respectfully submitted,
>
> JOHN H. DURHAM
> UNITED STATES ATTORNEY
>
> _____/s/_____
> AMANDA S. OAKES
> ASSISTANT U.S. ATTORNEY
> FEDERAL BAR NO. ct30310
> amanda.oakes@usdoj.gov
> 157 Church Street, 25th Floor
> New Haven, CT 06510
> Tel: (203) 821-3700

# **CERTIFICATION**

       I hereby certify that on October 4, 2020, a copy of the foregoing was filed electronically and served to anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

                                                    /s/
                                      AMANDA S. OAKES.
                                      ASSISTANT U.S. ATTORNEY